## BODELL v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4105.

Circuit Court of Appeals, First Circuit.

March 15, 1946.

Richard F. Canning, of Providence, R. I. (Ira Lloyd Letts and Andrew P. Quinn, both of Providence, R. I., of counsel), for petitioner for review.

Helen Goodner, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., and J. P. Wenchel, Chief Counsel, and Claude R. Marshall, Sp. Atty., Bureau of Internal Revenue,

both of Washington, D. C., of counsel), for the Commissioner.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This case comes before us on a petition for review of a decision by the Tax Court which determined a deficiency of $13,207.72 in the income tax payment of the taxpayer for the year 1939.

On May 11, 1937, pursuant to a plan previously approved, certain stockholders of Investors Corporation, hereinafter referred to as "Investors," exchanged their holdings for stock in Investors Trust Company, hereinafter referred to as "Trust." During the hurricane and flood in 1938, many of the pertinent records were destroyed, among which were the records showing the value and number of shares of each class of stock of Investors which each of the transferors exchanged for stock in Trust. However, a summary showing the value and number of shares of each class of stock of Investors which were surrendered and the value and number of shares of common and preferred stock of Trust which were received in exchange therefor was salvaged. The Tax Court admitted in evidence this summary[1] because it found

[1] * Table I.

| Transferors | Value of property (Stock of Investors Corporation) transferred to Investors Trust in exchange for its stocks. | Aggregate Value of Stock Received | Aggregate Loss Sustained |
|---|---|---|---|
| 1. Group of 1st preferred stockholders—7,037 shares at $100 a share and dividends of $3,518.50 | $707,218.50 | $633,330.00 | $73,888.50 |
| 2. Group of 2nd preferred shareholders option A 358 shares at $100 and dividends of $11,340 | 47,140.00 | 37,712.00 | 9,428.00 |
| 3. Group of 2nd preferred shareholders option B 2,292 shares at $100 and dividends of $72,660 | 301,860.00 | 252,948.00 | 48,912.00 |
| 4. Group of convertible preferred shareholders option A 223 shares at $100 a share and dividends of $6,979 | 29,279.00 | 23,423.20 | 5,855.80 |
| 5. Group of convertible preferred shareholders option B 2,937 shares at $100 a share and dividends of $92,721 | 386,421.00 | 323,821.80 | 62,599.20 |
| 6. Group of common shareholders 83,738¾ shares at $4.5477 a share | 380,818.70 | 298,960.00 | 81,858.70 |
| Totals | $1,852,737.20 | $1,570,195.00 | $282,542.20 |

Table 2.

| Transferor Described Above | Percentage of Total Assets Transferred | Percentage of Value of Total Stock Received | Difference between Percentages In Col. 1 & 2 | Percentage of "Spread". Comparison, on percentage basis, between Col. 1 and 3 |
|---|---|---|---|---|
| Group 1 | 38.1716 | 40.3345 | +2.1629 | +5.6662 |
| Group 2 | 2.5443 | 2.4017 | — .1426 | —5.6046 |
| Group 3 | 16.2927 | 16.1093 | — .1834 | —1.1256 |
| Group 4 | 1.5803 | 1.4917 | — .0886 | —5.6065 |
| Group 5 | 20.8568 | 20.6230 | — .2338 | —1.1209 |
| Group 6 | 20.5543 | 19.0398 | —1.5145 | —7.3682 |

* Certain immaterial figures have been omitted.

that it was able to determine thereby the maximum change which could have been effected in the interest of any transferring stockholder.[2] The taxpayer, who was one of the transferring stockholders of Investors, exchanged his stock in Investors for stock in the Trust as shown in the margin.[3]

The taxpayer did not attempt to deduct in his return for 1937 the difference between the value of the stock received and the cost of the stock transferred. On December 26, 1939, the taxpayer sold for $12,000 three thousand shares of Trust common stock which he had acquired by virtue of the exchange, and in his return for 1939 claimed a loss of $196,051.46, computed by deducting the $12,000 received from $208,051.46, the cost of the Investors common stock which he had transferred in exchange for these 3000 shares. Because of the 50% limitation on long term losses[4] the taxpayer computed his deductible loss as $98,025.73, 50% of $196,051.46, and paid his tax on this basis. The Commissioner assessed a deficiency of $13,207.72 on the theory that the taxpayer's basis for determining the amount of loss was not the cost to him of the common stock of Investors which he had exchanged for the 3000 shares of common stock of Trust, but was the fair market value of the 3000 shares at the time of their acquisition, May 11, 1937, or $120,000. Thus the Commissioner determined that the taxpayer's loss was $108,000, $120,000 minus $12,000, and that his long term loss deduction was $54,000, 50% of $108,000. The decision of the Commissioner was upheld by the Tax Court.

The question before this court is whether the taxpayer's basis for determining his loss on the sale of the 3000 shares of Trust common stock is the cost to him of the shares of common stock which he transferred to the Trust in exchange for these 3000 shares, $208,051.46, or whether his basis is the fair market value of these shares at the time he acquired them $120,000. The answer depends upon the applicability or non-applicability of § 112(b) (5) of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, § 112(b) (5).[5] Ordinarily, the basis for determining gain or loss on the sale or exchange of property

---

[2] The taxpayer cannot and does not complain of the inaccuracy of this summary which represents the maximum possible spread since it was the best evidence he could produce to show the effect of the transfer on each of the transferors. Nor can the government complain since the records showing the effect on the transferors individually would show at least no greater spread and probably a substantially smaller spread for if the holdings of some of the individuals were divided among the six groups or among any two or more of these groups the spread between the individual who suffered the most and the one who suffered the least would be less than the spread between Group 1 and Group 6.

[3]

| Shares of Investors Corporation-Owned | | Cost | Shares of Investors Trust Co. Received | Value on date of Exchange |
|---|---|---|---|---|
| 892 | 2nd Preferred | $30,000.57 | 892 Preferred and | $40,140.00 |
| | | | 892 Common | 35,680.00 |
| 263 | Convertible Preferred | 968.87 | 263 Preferred and | 11,835.00 |
| | | | 263 Common | 10,520.00 |
| 33,523 | Common | 211,453.13 | 3,048 Common | 121,920.00 |
| | Total | $242,422.57 | | $220,095.00 |

[4] Internal Revenue Code, § 117(b), 26 U.S.C.A. Int.Rev.Code, § 117(b).

[5] "Sec. 112. Recognition of gain or loss—
* * * * * * * * * * * * *
"(b) Exchanges solely in kind—
* * * * * * * * * * * * *
"(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * * *"

is its cost,[6] in this case $120,000. But where property is acquired upon a tax free exchange such as that described in § 112 (b) (5), then its basis "shall be the same as in the case of the property exchanged * * *", Int.Rev.Code, § 113(a) (6), 26 U.S.C.A. Int.Rev.Code, § 113(a) (6), in this case, $208,051.46. Hence if the requirements of § 112(b) (5) were satisfied by the exchange the taxpayer's basis will be the cost to him of the property transferred, $208,051.46, but if § 112(b) (5) is not applicable the taxpayer's basis will be the fair market value at the time of the exchange of the property received, $120,000.

The parties agree that the control requirement of § 112(b) (5) as defined in § 112(h) of the Internal Revenue Code was satisfied.

The Tax Court decided that the exchange on May 11, 1937, was not one contemplated by § 112(b) (5) since the requirement that "the amount of the stock and securities received by each" (transferor) be "substantially in proportion to his interest in the property prior to the exchange" was not met. It professed to apply the test laid down in United Carbon Co. v. Commissioner, 4 Cir., 1937, 90 F.2d 43. In that case the Commissioner had contended that the determination of whether the prior and subsequent interests of each transferor were in substantial proportion depended on the comparison between the proportionate share of each in the total assets transferred and his proportionate share in the total amount of stock received. The taxpayer contended that the proper comparison was between the value of the property transferred by each party and the value of the shares of stock which each received. The test urged by the Commissioner has been called the "control" test since it is based on a comparison between the degree of control which each transferor had over the total assets transferred and the degree of control which he acquired over the stock and securities received. The test urged by the taxpayer has been called the "relative value" test since it compares the value of the property exchanged by each transferor with the value of the property he received. The Court, in the United Carbon case, rejected the "control" test and applied the "relative value" test. In that case there were four-teen transferors delivering a total of assets valued at $9,933,204.12 for the same aggregate value of stock. One of the transferors, the Pelican Carbon Company, surrendered 4.78% of the total assets transferred, or property valued at $474,535.90. It received 3.42% of the value of the stock received by all the transferors or $339,735.74 worth of stock. Thus, from the point of view of control it suffered a loss of 1.36%; that is, it controlled 1.36% less of the total stock received than of the total property transferred. From the point of view of value it suffered a loss of 28.41% for it acquired property worth 28.41% less than the value of the property it transferred. Liberty Carbon Company transferred 2.58% of the total assets transferred or property valued at $256,293.92 and received stock valued at $312,499.17, or 3.15% of the aggregate value of the stock received. An application of the "control" test shows a gain of .57% while an application of the "relative value" test shows a gain of 21.93%. Humphreys Carbon Company transferred assets valued at $1,109,925.86, or 11.17% of the total assets transferred, and received $1,245,016.81 worth of stock or 12.53% of the aggregate value of stock received by all the transferors. The "control" test shows a gain for Humphreys of 1.36% while the "relative value" test shows a gain of 12.17%. Thus on the "control" test the widest variation was between Pelican's loss of 1.36% and Humphrey's gain of 1.36%, a spread of 2.72% and on the "relative value" test the widest spread was between Pelican's loss of 28.41% and Liberty's gain of 21.93%, a spread of 50.34%. The court said that the 2.72% "control" test spread would not be inconsistent with the application of § 112 (b) (5) but it held that the "control" test was not the test contemplated by the statute; that the "relative value" test was the proper criterion for determining the question of substantial proportion and that the spread of over 50% under that test was too great to permit the application of the statute.

The Tax Court discussed the United Carbon case and went on to apply the rule there set forth. It is evident that the Tax Court considered the "control" test, for the figures involved in that test were discussed and the ultimate decision of the court was apparently based on these figures, i. e., the

---

[6] Internal Revenue Code, § 113(a), 26 U.S.C.A. Int.Rev.Code, § 113(a).

2.1629% gain in control by the first preferred stockholders, and the 1.5145% loss in control by the common stockholders, or a spread of 3.6774%.[7] However, it also considered what it thought was and what the taxpayer had set forth as the "relative value" test. This is apparent from the court's mention of the 13% figure. This 13% figure was computed by a misapplication of the "relative value" test. The taxpayer's computation was based on a comparison of the percentage of total assets transferred by each group of stockholders with the difference between the percentage of total assets transferred and the percentage of the value of the total stock received by each group, that is, by dividing Column 1 of Table 2, in Footnote 1, into Column 3 of that table. In the case of Group 1, the first preferred stockholders, this computation shows a percentage of spread of +5.662, and in the case of Group 6, the common stockholders, a percentage of spread of —7.3682. A comparison of these two extremes shows a variation of 13.0344%. This method was not the method used in the United Carbon case for the determination of relative values nor does this method involve a comparison of value transferred with value received. Rather does it result in a comparison of control transferred with control acquired. It shows the percentage of gain or loss *of control* of the total assets. The "relative value" test is applied not by comparing percentage of control figures but by comparing value figures. A computation for the various groups on the basis of the proper relative value computation is set forth below.[8]

Thus, on the proper application of the "relative value" test, we see that Group 1 has suffered a loss of 10.45% and Group 6 a loss of 21.49% so that the spread between Group 1 and Group 6 is 11.04%.

This method of computation, which we deem to be the proper "relative value" test, was not discussed in the opinion of the Tax Court.

We must now consider whether the words "substantially in proportion" of § 112(b) (5) are to be viewed in the light of the "relative value" test or in the light of comparative control. An analysis of the cases shows that the Circuit Courts of Appeals have accepted either expressly or implicitly the "relative value" test which was set forth in the United Carbon case. Budd International Corporation v. Commissioner, 3 Cir., 1943, 143 F.2d 784; Commissioner v. Lincoln-Boyle Ice Co., 7 Cir., 1937, 93 F.2d 26; Blair v. Commissioner, 2 Cir., 1937, 91 F.2d 992; Snead v. Jackson Securities & Investment Co., 5 Cir., 1935, 77 F.2d 19, certiorari denied Jackson Securities & Investment Co. v. Snead, 296 U.S. 599, 56 S.Ct. 115, 80 L.Ed. 424. We have been unable to discover any decision in appellate courts supporting the "control" test. On the authority of the cases cited above and on sound reasoning, we believe that the "relative value" test is the test called for by the statute. In discussing what is now § 112(b) (5), the Court in the United Carbon case, supra, at pages 46, 47 of 90 F.2d said:

"It was designed primarily to affect the income tax liability of the transferors and to except them in the given circumstances from the operation of the general rule that the gain or loss from the sale or other disposition of property acquired after February 28, 1913, should be calculated in relation to its cost. This is clear, because the section speaks of the recognition of gain or loss upon the transfer of property by two or more persons to a corporation, and obviously refers to the gain or loss of these persons and not the gain or loss of the corporation. It is manifest from a

---

[7] See Column 3 in Table 2 in footnote 1.

[8]

|  | A Value of property transferred | B Value of stock received | C Loss Sustained | D Percentage of C to A * |
|---|---|---|---|---|
| Group 1 | $707,218.50 | $633,330.00 | $73,888.50 | 10.45 |
| Group 2 | 47,140.00 | 37,712.00 | 9,428.00 | 20. |
| Group 3 | 301,860.00 | 252,948.00 | 48,912.00 | 16.2 |
| Group 4 | 29,279.00 | 23,423.20 | 5,855.80 | 20. |
| Group 5 | 386,421.00 | 323,821.80 | 62,599.20 | 16.2 |
| Group 6 | 380,818.70 | 298,960.00 | 81,858.70 | 21.49 |

* Column D is computed by dividing Column A into Column C. Perhaps the confusion which resulted in the erroneous method used by the taxpayer can be explained by the coincidence that his method and the proper method reach approximately the same results when applied to the figures in the United Carbon case.

practical viewpoint that when an owner of property transfers it to a corporation in exchange for stock and thereafter his interest in the corporation is of a value substantially equivalent to the value of the property transferred, he has realized no gain or loss; and hence Congress declared that in computing his income for purposes of taxation, no gain or loss from such a transaction should be recognized. But, on the other hand, if the asset possessed by the transferor after the exchange differs substantially in value from that which he previously possessed, a real change in his condition, for better or worse, has taken place; hence Congress provided that in such a case the exception to the general rule should not apply and the gain or loss involved in the exchange should be recognized."

This language is not an accurate description of the statute since "an exchange by two or more persons" may be nontaxable within § 112(b) (5) even though all transferors enjoy a gain on the transaction or may prevent a deduction even though all transferors suffer a loss, providing the loss or gain is one affecting them all substantially the same. The question in the latter part of the section is not whether each of the several transferors suffers a substantial loss or gain in value over the value of the assets he transferred but whether the gain or loss suffered by each was substantially proportionate to the gain or loss suffered by every other transferor. For example, three persons may each transfer $100,000 worth of property to a corporation and each may receive stock worth $75,000. Each has suffered a very substantial loss of $25,000 or 25%, but because the loss suffered by each was the same, it will not be deductible as a loss suffered on the exchange, if the other provisions of this section are satisfied. We feel that in the provisions under discussion Congress was concerned with value rather than control. Whether a man has a proportionately greater or less control of the assets received than of the assets transferred is not relevant to income taxation. Income taxation deals with money values, money gains and losses. For this reason we believe that a comparison of values

rather than a comparison of control is the proper method for determining substantial proportion.

The taxpayer has argued that the relative value spread, in this case, 11.04%, or as he computes it, 13.03%, is not a spread out of a possible 100% but out of a spread conceivably much greater. This possibility may be illustrated as follows: A and B transfer assets valued at $100,000 to a corporation. The assets transferred by A are worth $1000 while the assets transferred by B are worth $99,000. The corporation delivers $100,000 worth of stock to A and nothing to B. Thus A has realized a gain of $99,000 or 9900% of the value of the property he transferred. B has lost $99,000 or 100% of what he transferred. Thus we have a spread of 10,000% between A's gain of 9900% and B's loss of 100%. The taxpayer uses a similar illustration as the ground for his argument that we must consider the spread of 11.04%, or 13.03% as he computes it, as against a possible spread of 10,000%, or more, in order to determine whether the requirement of substantial proportion has been met. This situation is inconceivable unless B intended a gift to A of $99,000 worth of property. Even if we assume that such a situation were conceivable as a bona fide business transaction, or that a gift by B to A would not bar the operation of § 112(b) (5), we cannot agree with the taxpayer that the actual spread is to be considered only in relation to the maximum possible spread. Our tax laws are concerned only with concrete situations. They are not concerned with what a man might have lost or gained but only with what he did lose or gain. To use the comparison suggested by the taxpayer is to reduce logic to absurdity. Such a standard would make nearly every such exchange non-taxable at the time of the exchange insofar as the substantial proportion clause is concerned. The spread of over 50% in the United Carbon case or the spread of 62.62% (our computation) in Budd International Corporation v. Commissioner, supra, or even the spread of 90% in Commissioner v. Lincoln-Boyle Ice Co., supra, might not be deemed substantial were it compared to a possible spread of 10,000% or more.[9]

---

[9] The taxpayer's statement that the application of the control test could result in a maximum spread of 99% is erroneous. An examination of the hypothetical situation shows that B has lost 99% while A has gained 99% of the total assets. Thus even on the control test the maximum spread would be 198%, or greater if B transferred more than 99% and A less than 1% of the total assets transferred.

The taxpayer further argues that the amount of disproportion, as a practical matter, was the closest to an equal proportion that the draftsmen of the exchange plan could have come, having in mind that they were dealing with four classes of stockholders of Investors and giving two classes alternative options. Because of this, he submits that some variation must be allowed. But Congress has taken all this into consideration. Rather than require an *exactly* proportionate exchange, Congress has required only a *substantially* proportionate exchange.

Having decided that the proper test for determining substantial proportion is the relative value test and having determined that the correct application of that test results in the spread of 11.04% between Group 1, the group which suffered the least by virtue of the exchange, and Group 6, the group which suffered the most, we must now decide whether the ultimate finding of fact by the Tax Court that a substantial disproportion existed between these two groups, was warranted. We feel that it was. A spread of over 11% is indeed substantial. A simple illustration bears this out. If A and B, each owning $100,000 worth of property, transfer this property to a corporation in exchange for stock and A receives stock valued at $90,000 while B receives stock valued at $79,000, A has suffered a loss of only 10% while B has suffered a loss of 21%. The difference between their losses of 11%, or $11,000 on the same initial investment, could hardly be deemed insubstantial. Even though we believe the Tax Court did not apply the proper test, we feel that it reached the correct result.

The decision of the Tax Court is affirmed.